Denise TAYLOR, Administratrix of the Estate of Lanny Taylor, Deceased, Plaintiff–Appellant,

v.

FRANKLIN COUNTY, KENTUCKY, et al., Defendants–Appellees.

No. 02–6470.

United States Court of Appeals, Sixth Circuit.

July 14, 2004.

Orville Curt Davis, Somerset, KY, Gregory A. Belzley, Dinsmore & Shohl, Louisville, KY, for Plaintiff-Appellant.

Richard M. Sullivan, Conliffe, Sandmann & Sullivan, Louisville, KY, Robert L. Chenoweth, Chenoweth Law Office, Frankfort, KY, for Defendants-Appellees.

Before: SUHRHEINRICH and CLAY, Circuit Judges; and GWIN, District Judge.*

CLAY, Circuit Judge.

Plaintiff, Lanny Taylor,[1] appeals from an order entered on October 31, 2002, by the district court granting Defendants, Franklin County, Kentucky, James Kemper, Jr., George Rose, Ted Hammermeister, and Richard Mazzacone, summary judgment; and dismissing Defendant Sally Maxwell from Plaintiff's suit alleging a violation of Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment, while incarcerated at the Franklin County Correction Complex ("FCCC" or the "jail"), under Title 42 U.S.C. § 1983. Because we believe the district court erred with respect to Defendants Rose, Mazzacone and Maxwell's entitlement to qualified immunity, but not as to Defendants Kemper and Hammerstein, this Court will AFFIRM in part and REVERSE in part, the district court's decision.

## I

## BACKGROUND

On March 17, 2000, Plaintiff filed this action against Defendants James Kemper, Jr., George Rose, Ted Hammermeister, Richard Mazzacone, and Sally Maxwell—all government employees at the FCCC—in their individual and official capacities, as well as Franklin County, Kentucky, for violating Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment while incarcerated at the FCCC. On July 15, 2002, Defendants filed a motion for summary judgment as to all of Plaintiff's claims, to which Plaintiff responded in opposition. On October 17, 2002, the district court granted Defendants' motion and dismissed all of Plaintiff's claims, with the exception of Plaintiff's negligence allegation against Defendant Sally Maxwell. On October 31, 2002, after granting Plaintiff's request to dismiss the remaining claim against Defendant Maxwell voluntarily, the court entered its final judgment. Plaintiff then filed a timely notice of appeal on November 13, 2002, requesting review of the suit in its entirety.

---

* The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

1. After Mr. Taylor's death, his wife and administratrix of his estate, Denise Taylor, replaced Mr. Taylor as Plaintiff.

Plaintiff was incarcerated on January 27, 2000,[2] at the FCCC on a twenty-one day sentence for the misdemeanor offense of giving false information to a police officer. On February 5, 2000, Plaintiff submitted a medical request form to the FCCC medical facility, complaining of severe back pain. Plaintiff was seen two days later, on February 7, 2000, by the facility's nurse, Defendant Sally Maxwell. Upon examination of Plaintiff, Defendant Maxwell's notes indicated Plaintiff complained that his "whole spine hurt" and that he took "Tylenol 3 and Valium" daily for back pain. Defendant Maxwell observed that Plaintiff could "touch his toes, twist, [ ]stand on heels and toes," and consequently advised Defendant he need only purchase Advil at the jail's canteen.

Plaintiff complained of severe back pain again through a medical request on February 10, 2000, which also included complaints of a loss of appetite and weight loss. Defendant Maxwell examined Plaintiff the following day and again advised him to purchase Advil. Plaintiff asserts that Defendant Maxwell never discussed Plaintiff's two other complaints listed on the medical request; that of weight and appetite loss.

On February 12, 2000, Plaintiff fell in one of the FCCC stairwells. At that time Plaintiff was incarcerated in F pod, a second story communal cell. After being alerted to the incident by another inmate, pod officers sent a "Code 100" alert, signifying a medical emergency. Defendant,

Sgt. George Rose, found Plaintiff laying in the stairwell outside of F pod. Plaintiff told Defendant Rose that he had fallen and could not feel his feet. Defendant Rose testified that he "advised [Plaintiff] that [he] would call an ambulance, and have him transported to the hospital, but that if the doctor didn't find anything wrong, [Rose] would file criminal charges against [Plaintiff], and make sure [Plaintiff] had to pay the bill." Defendant Rose testified that Plaintiff then said he was fine, got up and walked back to his pod. Defendant Rose filed an incident report that was reviewed by Defendant Kemper, the director of the jail, and Defendant Maxwell. Maxwell was made aware of the incident, but did not further investigate Plaintiff's condition. Defendant Rose claims there was no previous contact with Plaintiff before February 12, 2000, and no subsequent interaction after Plaintiff's stairwell accident. Additionally, Rose asserts that he was unaware of Plaintiff's previous claim of severe back pain prior to his encounter with Plaintiff on the stairwell, or that Plaintiff later suffered any additional ailments.

Subsequent to Plaintiff's stairwell incident, his condition rapidly deteriorated. Inmates complained of Plaintiff's hygiene, stating that he was not bathing, and suffered from bladder incontinence. Although all of the FCCC inmates were observed very closely, approximately every hour on the hour in their pods, many officers in the jail testified that they could not remember whether or not Plaintiff showered, stood on his two feet indepen-

---

**2.** There is a factual discrepancy as to Plaintiff's incarceration date. Plaintiff's appellate brief and the district court judgment state Plaintiff was incarcerated on February 3, 2002; however, Plaintiff's second amended complaint states Plaintiff was initially incarcerated on January 27, 2000, and the deposition testimony of Defendant, Sally Maxwell, indicates that her first interaction with Plaintiff was on January 28, 2000. Plaintiff disput-

ed the testimony relating to the January 28, 2000 interaction between Plaintiff and Defendant Maxwell in its *Motion in Limine,* before the district court, because the interaction is based on testimony that states Plaintiff was in confinement at the FCCC on January 28, 2000, going through alcohol withdrawal. The district court did not rule on this motion, because it was moot upon the dismissal of the action.

dently, or changed his uniform after the stairwell accident.

Additionally, there is a factual dispute between the parties regarding Plaintiff's ability to walk on or around February 15, 2000. Defendants claim that Plaintiff walked, without assistance, into nurse Maxwell's office on February 15, 2000, to have a TB test administered, and returned on February 17, 2000, for the results. Plaintiff, however, disputes this allegation and maintains there are no individuals at the jail, other than Defendants Maxwell and Mazzacone, who can testify to Plaintiff's presence in nurse Maxwell's office, or to any significant movement after his stairwell accident on February 12, 2000.

On February 22, 2000, Plaintiff's wife, Denise Taylor, was informed that Plaintiff had complained of his inability to walk and that he was suffering bouts of incontinence without assistance from the jail personnel. Mrs. Taylor then called the jail to lodge a complaint, and told the officer, with whom she spoke, that Plaintiff could not walk or take care of himself, and asked how long the officers were going to allow Plaintiff to "lay in his own feces."[3] After speaking with Mrs. Taylor, two officers went to check on Plaintiff and found him lying in his bunk bed, unable to walk, and smelling of urine.

Inmates with whom Plaintiff was housed allegedly informed officers, approximately five days prior to Mrs. Taylor's call, that Plaintiff could not walk. On the day of Mrs. Taylor's call, Plaintiff was carried from the communal jail pods to an isolation cell in protective custody. There is also a factual dispute as to whether or not he was dragged by officers, with unsupported legs, or whether officers carried Plaintiff to his isolation cell with legs dangling.

On February 23, 2002, Plaintiff was in protective custody when Defendant Sgt. Mazzacone came to return Plaintiff to his original F pod cell. Upon being instructed to return to his pod, Defendant testified that Plaintiff again stated he could not walk. Plaintiff claimed he could not move his legs and requested medical attention. Defendant Mazzocone claims that he observed Plaintiff move his legs and also observed urine in the commode of his protective cell. Defendant Mazzacone then took the corner of the mattress on which Plaintiff was lying and dragged Plaintiff on the mattress through the hallway of the jail to Defendant Maxwell's nursing station. Defendant Maxwell observed Plaintiff and also testified to his leg movement, and helped Defendant Mazzacone drag Plaintiff on the mattress through the hallway and back to his pod. The jail itself is equipped with wheelchairs; however, Defendants did not once utilize one in transporting Plaintiff within the jail.

Upon being returned to the pod, Plaintiff was observed being helped to the shower by other inmates, who then requested another uniform because Plaintiff still suffered from incontinence. On February 24, 2000, Plaintiff's discharge day, Plaintiff was unable to dress himself. Defendant Mazzacone and another officer helped Plaintiff change from his uniform into his own clothes. While waiting for Plaintiff to be released, Plaintiff's brother, Charles Taylor, was told by officers in the jail that even though Plaintiff claimed he could not walk, the jail staff "knew he could." Plaintiff's brother testified that he saw Plaintiff being dragged on a mat,

---

**3.** It is disputed as to whether Plaintiff actually laid in his own feces. Defendants claim there is no evidence establishing that anyone ever smelled feces on Plaintiff. Furthermore, Defendants claim that medical notes establish that once Plaintiff was admitted to the hospital after his release from jail, he reported being constipated for days.

down a hallway, just prior to his release. Defendant Mazzacone claims that he and another officer assisted Plaintiff during his discharge; they claim they carried him outside and lowered him on to the sidewalk. Plaintiff's family claims they found Plaintiff laying on the sidewalk without shoes or a jacket outside of the inmate exit. A garbage bag, containing Plaintiff's personal items, was lodged beneath his head.

Plaintiff's brother subsequently picked Plaintiff up from the ground and placed him into the car. Plaintiff's wife testified that upon greeting Plaintiff, she became nauseous from his odor. Once they arrived home, Plaintiff's family called an ambulance, and Plaintiff was on his way to a hospital less than 30 minutes later. Plaintiff was taken to the Lake Cumberland Regional Hospital's emergency room, but then transferred to the University of Kentucky Medical Center. Upon admission to the hospital and examination by the doctors, Plaintiff was diagnosed with a 5″ by 4″ by 4″ malignant cancerous tumor wrapped around Plaintiff's lower thoracic spine, resulting in paralysis from the waist down, and incontinence. According to Plaintiff's oncologist, all of his jail symptoms were completely consistent with his form of cancer. Plaintiff claims there was also a bedsore on his tail bone, upon admission into the hospital, suggesting Plaintiff was previously lying in a motionless state for quite some time. Plaintiff later died on March 24, 2000, four weeks after his release from jail. No one at the FCCC was subsequently reprimanded for the mistreatment of Plaintiff.

Following is a synopsis of the remaining Defendants involved in this suit and their interaction with Plaintiff:

*James Kemper, Jr.*

Defendant James Kemper, Jr. served as the direct supervisor of all other Defendants at all times relevant to this claim. There are no facts alleged by Plaintiff describing any direct interaction with Plaintiff. Defendant Kemper was first made aware of Plaintiff's complaints after reading Defendant Rose's incident report regarding Plaintiff's fall on the stairwell. Defendant Kemper did not receive another incident report regarding Plaintiff until February 23, 2000, where Plaintiff requested a new uniform after a bout of incontinence. Nevertheless, this report was not seen until February 24, 2000, the day of Plaintiff's release. Furthermore, Defendant Kemper did not review any medical decisions made by Defendant Maxwell.

*Lt. Ted Hammermeister*

Defendant, Lt. Hammermeister, is a transport officer, court liaison and the immediate supervisor to shift-supervisors Defendant Rose and Defendant Mazzacone. Defendant Hammermeister testified that he handles all shift supervisors' grievances by bringing them directly to Defendant Kemper. Defendant Hammermeister also has the responsibility of transporting inmates, which keeps him away from the jail more often than not. The first personal encounter between Defendant Hammermeister and Plaintiff was on the first day of Plaintiff's arrival at the jail; however, Plaintiff alleges no complaints with reference to that day. The second encounter allowing Hammermeister to become acquainted with Plaintiff's situation was on Plaintiff's release day. Defendant Hammermeister was told that Plaintiff would not change out of his uniform. *Id.* Defendant Hammermeister claims he knew of no specifics regarding Plaintiff's injuries or claims between his first encounter with Plaintiff and the last. Defendant Hammermeister had knowledge of Plaintiff's stairwell accident, but cannot recall with clarity when and how he discovered the information.

## II

## DISCUSSION

This Court reviews an order granting summary judgment *de novo, Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 572 (6th Cir.2000), and as a purely legal determination, the district court's denial of qualified immunity in a summary judgment motion is also subject to *de novo* review. *Thomas v. Cohen,* 304 F.3d 563, 568 (6th Cir.2002). A moving party is entitled to summary judgment as a matter of law when there are no genuine issues of material fact. Fed.R.Civ.P. 56(c); *see also United Nat'l Ins. Co. v. SST Fitness Corp.,* 182 F.3d 447, 449 (6th Cir.1999). The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.,* 276 F.3d 845, 848 (6th Cir.2002). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies this initial burden, the non-moving party must then "set forth the specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). That is, the non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. Furthermore, when deciding if summary judgment is proper, we must view the evidence in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### A. § 1983 Violation

In the instant action, Plaintiff alleges that the prison personnel of the FCCC ignored his medical condition and deprived him of the care necessary to attend to his serious medical needs. Plaintiff continuously complained of serious pain and discomfort and exhibited a loss of mobility, which resulted in nothing but a lack of response or sufficient assistance from prison personnel.

Plaintiff alleges a violation of his Eighth Amendment right to be free from cruel and unusual punishment in this § 1983 claim. U.S. Const. amend. VIII. This Court has previously held that the legal standard applied to an Eighth Amendment claim regarding an alleged deprivation of medical care for prisoners is a showing of "deliberate indifference" toward an inmate's medical needs. *Terrance v. Northville Regional Psychiatric Hospital,* 286 F.3d 834, 843 (6th Cir.2002) (citing *Williams v. Mehra,* 186 F.3d 685, 691 (6th Cir.1999)) (*en banc*). "In order to state a cognizable [§ 1983] claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal citation omitted). Therefore, a prison official can only be found liable for denying a prisoner humane conditions if that official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). This is better known as the objec-

tive and subjective components of an Eighth Amendment violation.

■ To satisfy the objective component, Plaintiff must establish that his medical needs, which included claims of serious back pain, loss of feeling in his feet and legs, and bouts of incontinence, were "sufficiently serious" to warrant the requisite medical attention. *Comstock,* 273 F.3d at 703 (quoting *Farmer,* 511 U.S. at 834). This means that the "prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834 (internal quotations and citation omitted).

Courts have analyzed the seriousness of a deprivation by examining the effect of the delay in treatment. *Napier v. Madison County, Kentucky,* 238 F.3d 739, 742 (6th Cir.2001). In *Napier,* following several other circuits, this Court held that "an inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Id.* (citing *Hill v. Dekalb Regional Youth Detention Center,* 40 F.3d 1176, 1188 (11th Cir.1994)).

Here, Plaintiff was plagued with terminal cancer of the spine. This ailment seriously affected Plaintiff's mobility and control of his bladder, while causing great pain in his spinal column and lower extremities. Plaintiff's post-incarceration oncologist, Dr. E.H. Romond, testified as to the seriousness of Plaintiff's medical condition, and his observation of the level of pain from which Plaintiff suffered on the day of his release from jail. Dr. Romond testified that the tumor, when viewed through an MRI scan, grew to be approximately $5'' \times 4'' \times 4''$ by the time Plaintiff was admitted to the hospital, and infected the lower part of the spine and spinal cord. Dr. Romond stated that the tumor had been growing for some time, but became acutely worse while Plaintiff was incarcerated, given Plaintiff's symptoms. Dr. Romond also testified that the seriousness of a tumor's growth is not only predicated on the size of the tumor, but rather where it continued to grow; such as here, where it grew against Plaintiff's spinal cord, causing enough pressure to cut off the spinal cord's blood supply, and subsequently resulting in paralysis.

Upon Plaintiff's admittance to the hospital, the doctors were allowed to start Plaintiff on steroids to decrease the swelling of the tumor and pain therapy to control Plaintiff's discomfort. Such obvious signs of reoccurring incontinence and debilitating immobility were clear symptoms of a serious problem, even if Defendants did not chose to believe Plaintiff.

Given the verified medical testimony of the seriousness of Plaintiff's condition, this Court views Plaintiff's complaints of back pain, loss of mobility and bladder incontinence [4] as serious medical conditions which placed Plaintiff in substantial risk of developing greater health problems when left untreated.

To satisfy the subjective component, Plaintiff must establish that Defendants had subjective knowledge of Plaintiff's risks of serious harm to his back and legs given the progression of his painful symptoms, and that Defendants simply disregarded it. Although this burden falls on

---

**4.** Defendants claim that incontinence is not a serious medical condition, and might actually be considered fairly common. Defendants make reference to a simple solution to such a condition; such as the use of adult diapers. However incontinence, as testified to by Dr. Romond, is a reaction to Plaintiff's tumor interrupting the normal functions of his nervous system.

Plaintiff, the Supreme Court has warned courts that a prison official may "not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risks he strongly suspected to exist." *Farmer*, 511 U.S. at 843 n. 8. Furthermore, "[w]hether a prison official has the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inferences from circumstantial evidence." *Id.* at 842.

Subjectivity is where this case turns, as this Court departs from the district court's analysis. The named Defendants, in the instance case, did not have the same level of contact with Plaintiff during his incarceration; therefore, all of the Defendants may not be liable for violating Plaintiff's Eighth Amendment right.

### 1. *Sgt. George Rose*

■ According to the facts in the record, Sgt. Rose's interaction with Plaintiff is limited to Plaintiff's fall in the stairwell on February 12, 2000. Sgt. Rose's attempt to help Plaintiff that day came with a threat to penalize Plaintiff if his injuries could not be verified once Plaintiff received medical assistance. At the time of Plaintiff's fall, Plaintiff had previously complained of back pain, albeit not directly to Sgt. Rose. Although Sgt. Rose did not have previous knowledge of Plaintiff's condition prior to his fall, it is undisputed that Plaintiff vocalized his immobility after the accident. The evidence that Plaintiff moved on his own and walked back to his pod after Defendant Rose's threat, is not conclusive as to the truth or falsity of Plaintiff's complained of condition, or of Defendant Rose's justification for his suspicion of Plaintiff's complaints. The act of Plaintiff getting up and walking back to his pod on that day does not negate Plaintiff's previ-

ous or subsequent acts that clearly illustrated Plaintiff's pain, such as his complaints of back and leg pain prior to the fall. This is particularly so since it is unknown how much pain Plaintiff endured when he, in fact, got up from his stairwell fall, or whether the possibility of being charged for alleging an injury was enough to induce Plaintiff to bear the pain—even if the injury was serious. The Court cannot automatically infer that the fall and/or Plaintiff's pain from the fall did not result from his very serious medical condition, or that Defendant Rose was reasonable in denying Plaintiff medical assistance. Therefore, although the record indicates that Defendant Rose's knowledge regarding Plaintiff's condition was quite limited, Plaintiff made Defendant Rose aware that he was in need of medical assistance, and Defendant Rose simply disregarded Plaintiff's need. Plaintiff offers sufficient evidence to require the jury to decide whether Defendant Rose's failure to act rises to the level necessary to establish his deliberate indifference. *Terrance*, 286 F.3d at 843.

### 2. *Richard Mazzacone*

■ Plaintiff alleges that Defendant Mazzacone had the subjective knowledge of Plaintiff's serious lower back and leg pains, including Plaintiff's loss of mobility because he personally observed Plaintiff's immobile state more than once, heard stories from other inmates and guards regarding Plaintiff's immobility and incontinence, and simply disregarded it all. Defendant Mazzacone alleges that he never knew of the seriousness of Plaintiff's ailment because he had observed inconsistencies in Plaintiff's complaints and actions. For example, Mazzacone did not believe Plaintiff's complaint of immobility after he allegedly witnessed Plaintiff moving his legs on two occasions.

Mazzacone was the supervisor of the officers on duty the night Mrs. Taylor called the jail on February 22, 2000, regarding the care of her husband. The officer who took the call reported this to Mazzacone, who in turn sent two guards to look into Plaintiff's condition. There is a factual issue as to the extent of Mazzacone's knowledge of Plaintiff's condition at this point. Additionally, Mazzacone was the guard who reported to Plaintiff's cell on the morning of February 23, 2000, to move Plaintiff from protective custody to his pod. At that time, Plaintiff complained of back pain and could not stand up. Mazzacone alleges he saw urine in the commode and movement in Plaintiff's legs; therefore, Mazzacone automatically assumed Plaintiff lied regarding his medical complaints. Nevertheless, Mazzacone took Plaintiff to the nurses station so that Defendant Maxwell could examine him, suggesting that he at least perceived Plaintiff's risk of serious harm.

Here, a genuine issue arises as to how skeptical Defendant Mazzacone was regarding his subjective knowledge of Plaintiff's alleged ailment. Federal courts have held that "less flagrant conduct may also constitute deliberate indifference in medical mistreatment cases." Id. at 843–44 (citing McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir.1999) (holding that deliberate indifference may be established by a showing of grossly inadequate care, as well as a decision to take an easier but less efficacious course of treatment)). Defendant Mazzacone received sign after sign as to the seriousness of Plaintiff's claims from Plaintiff himself; however, Mazzacone chose to disregard the serious health risk in which the prison personnel, including Mazzacone, continued to place Plaintiff. Even if Mazzacone was made aware of Plaintiff's medical condition on the evening of February 22, 2000, when Plaintiff's wife called and placed Defendant Mazzacone on

notice, Plaintiff did not receive any medical care that evening, or the following day when Mazzacone dragged Plaintiff through the hallway on a mattress to Defendant Maxwell's office, or later on that day when both Mazzacone and Maxwell dragged Plaintiff on a mattress back through the hallways, to his cell, and especially not on February 24, 2000, when Mazzacone helped dress Plaintiff and carried him out, laying him alone onto the sidewalk, until his family came to retrieve him.

Throughout all of the various interactions Defendant Mazzacone had with Plaintiff, Plaintiff's injuries were most objectively obvious after the stairwell fall on February 12, 2000. Given that most of Mazzacone's interactions with Plaintiff occurred after that date, Plaintiff's ailments should have been reasonably obvious to Mazzacone. Additionally, Mazzacone may not escape liability because of his refusal to believe the seriousness of Plaintiff's ailments, particularly when Mazzacone ultimately did not respond to the risk of Plaintiff's worsening condition as his pain increased, resulting in Plaintiff continuing to suffer. Farmer, 511 U.S. at 847 (holding that a prison official may be held liable under the Eighth Amendment for denying humane conditions upon confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measure to abate it). Material facts exist with regard to whether Defendant Mazzacone's conduct was highly unreasonable and reflected deliberate indifference.

3. *Sally Maxwell*

Plaintiff also alleges that Defendant Maxwell had subjective knowledge of Plaintiff's serious lower back and leg pains, including Plaintiff's loss of mobility, because Defendant had the opportunity to examine Plaintiff, on February 23, 2000,

when Plaintiff lost all ability to move his lower body and could not stand or walk. Nevertheless, Defendant Maxwell failed to do so, instead insisting that Plaintiff's allegations were false, and assisted Defendant Mazzacone in dragging Plaintiff, through the hallway on a mattress back to his pod. The district court contends that Maxwell is not liable because Plaintiff claims that Maxwell failed to diagnose Plaintiff's tumor, not that Defendant Maxwell denied him medical treatment. Since Maxwell's failure to diagnose is deemed by the district court to amount to nothing more than mere negligence, the district court did not deal with Maxwell's potential liability regarding her alleged deprivation of medical services, in relation to a possible constitutional violation. On appeal, Defendants dispute any knowledge Defendant Maxwell is alleged to possess with regard to Plaintiff's debilitating condition, stating Maxwell was not aware of Plaintiff's stairwell accident until she read the corresponding incident report, and that all of Defendant Maxwell's office interactions with Plaintiff resulted in Maxwell finding no serious ailments, despite what Plaintiff claimed.

Nevertheless, as with Defendant Mazzacone, Defendant Maxwell should have been on notice as to the seriousness of Plaintiff's condition on February 23, 2000, when Plaintiff appeared in front of her office lying immobile on a mattress, after being dragged there by Defendant Mazzacone. Defendant Maxwell was again then made aware of Plaintiff's complaints of chronic pain and of his immobility.

Since "less flagrant conduct may also constitute deliberate indifference in medical mistreatment cases," Defendant Maxwell's knowledge of Plaintiff's serious condition should be viewed as subjective awareness of potential risks, with deliberate intentions to disregard it. *Terrance,* 286 F.3d at 843–44. Material facts exist as

to whether Defendant Maxwell's professed ignorance towards Plaintiff's vocalized medical needs is proven and whether her conduct caused grossly inadequate medical care in violation of the Eighth Amendment. *Id.* at 844.

### 4. *Additional Defendants*

■ The remaining two individual Defendants, Kemper and Hammermeister, had very little interaction with Plaintiff as recorded in the record. To the extent Plaintiff is suing both of these individuals in their supervisory roles, or official capacity, they will be addressed under Municipal Liability, *infra* § II, A, 5. To the extent these Defendants are being sued in their individual capacity, their conduct toward Plaintiff does not illustrate the subjective knowledge that their acts or omissions were sufficiently harmful, so as to evidence deliberate indifference to serious medical needs. *Estelle,* 429 U.S. at 106.

### 5. *Municipal Liability*

■ The district court additionally granted summary judgment to Defendants as to the municipal liability of Franklin County regarding Plaintiff's § 1983 action. In reviewing summary judgment, the question is whether the non-moving party specified any city policy or custom causing the constitutional violations as required to hold the City accountable for the unconstitutional acts of its [officials]. *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiff's complaint specifies that it brings its claims against all Defendants in their individual and official capacities.

A suit against an individual "in his official capacity" has been held to be a suit directly against the local government unit and may result in the municipality's liability. *Leach v. Shelby County Sheriff,* 891

F.2d 1241, 1244 (6th Cir.1989). In order to hold a local entity liable for injuries under § 1983, a plaintiff must show that his injuries were the result of some "policy or custom" attributable to the government entity that contributed to Plaintiff's constitutional violation. *Monell*, 436 U.S. at 690. Here, Plaintiff must establish that the deprivation of medical services was part of a policy or custom of the FCCC.

Plaintiff argues that it is customary for prison officials to persuade inmates in need of medical assistance to "hold off" on seeing a doctor, due to budgetary pressures, until that doctor's scheduled visit to the facility—except in cases of emergencies. Unfortunately, Plaintiff has not alleged enough record evidence to show that there is a policy or custom that inmates be deprived of medical assistance for serious medical needs. Even if there is a protocol that persuades inmates to wait until a doctor is available if in need of medical attention, Plaintiff concedes that there is an exception for a medical emergency where an inmate is in serious need of medical attention. These circumstances would be the only scenarios that would trigger a constitutional violation; therefore, no support for municipal liability exists.

■ Plaintiff also alleges that Defendants Kemper and Hammermeister are liable as supervisors who acted with deliberate indifferent to Plaintiff's medical needs. This Court, in *Doe v. City of Roseville*, applied the standards of supervisory liability restating the scope this Court set out in *Clairborne County*. 296 F.3d 431, 440 (6th Cir.2002) (citing *Doe v. Claiborne County, Tenn.*, 103 F.3d 495 (6th Cir.1996)) (noting that under precedent, it is not enough for the plaintiff to show that the defendant supervisors were sloppy, reckless or negligent in the performance of their duties). In *City of Roseville*, this Court attached

qualified immunity because there was no affirmative determination that the defendants and school administrators were confronted "with conduct that was 'obvious, flagrant, rampant and of continued duration, rather than isolated occurrences,'" *Id.* (citing *Braddy v. Florida Dep't Labor & Employment Sec.*, 133 F.3d 797, 802 (11th Cir.1998)), or "with 'such widespread pattern of constitutional violations' [ ] that their actions demonstrated deliberate indifference to the danger of [the violator] abusing [more victims]." *Id.* (citing *Claiborne County*, 103 F.3d at 513). Moreover, if there is evidence that the defendants had some knowledge but did not address the issue or punish the responsible subordinate, "courts are not required to ignore the fact of life that policies can be and often are subtly but effectively promulgated by seemingly benign conduct." *Leach*, 891 F.2d at 1246.

In the instant action, however, there is no evidence establishing that Kemper or Hammermeister participated or encouraged the deprivations of Plaintiff's serious medical needs, and not enough sufficient evidence to establish a policy or custom within the FCCC that was followed by Kemper or Hammermeister. Therefore, there is no evidence of supervisory liability as to Defendants Kemper and Hammermeister in their official capacity, nor is there evidence of municipal liability.

## B. Qualified Immunity

■ Qualified immunity shields from liability for civil damages those officials whose "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Scicluna v. Wells*, 345 F.3d 441, 444 (6th Cir.2003) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). In analyzing qualified immunity claims, we employ

a sequential analysis prescribed by the Supreme Court in *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). First, plaintiffs must show that defendants deprived them of a right protected by the Constitution. *Thomas,* 304 F.3d at 569. Second, this right must be so clearly established that a reasonable officer would understand that his or her actions would violate that right. *Id.* To determine whether or not a right was "clearly established" the court must do so "in light of the specific context of the case, not as a broad general proposition." *Greene v. Barber,* 310 F.3d 889, 894 (6th Cir.2002) (quoting *Saucier,* 533 U.S. at 201).

Given the analysis of Defendant's conduct pertaining to Plaintiff's § 1983 allegation, *supra* § A, Plaintiff has come forward with sufficient evidence tending to show that Defendants Mazzacone, Rose and Maxwell violated Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment by depriving Plaintiff of his much needed medical assistance. *Comstock,* 273 F.3d at 702. Again, Plaintiff has not set forth with sufficiency that there are any material issues in dispute with respect to Plaintiff's allegation of an Eighth Amendment violation by Defendants Kemper and Hammermeister; therefore, the question regarding qualified immunity will only be further analyzed as to the conduct of Defendants Mazzacone, Rose and Maxwell.

Once it is concluded that Plaintiff has alleged facts which, if true, would establish a violation of Plaintiff's Eighth Amendment right, we must assess whether that right was clearly established in February 2000, such that a reasonable official would have understood that his conduct violated the right. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 197, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Danese v. Asman,* 875 F.2d

1239, 1244 (6th Cir.1989), *cert. denied,* 494 U.S. 1027, 110 S.Ct. 1473, 108 L.Ed.2d 610 (1990) (noting that if a prisoner asks for and needs medical care, it must be supplied.)).

Deliberate indifference to a prisoner's serious medical condition is a known violation of the Eighth Amendment right to be free from cruel and unusual punishment. *See Estelle,* 429 U.S. at 104 (holding that "deliberate indifference to serious medical needs of a prisoner" is "proscribed by the Eighth Amendment"). Acknowledging, but yet ignoring, the obviously debilitated state of a prisoner in need of medical attention is conduct that would alert a reasonable person to the likelihood of personal liability. *See Fitzke v. Shappell,* 468 F.2d 1072, 1076 (6th Cir.1972) (noting "[W]here the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process.").

Given the record on appeal, the district court erred by granting Defendants qualified immunity as to Plaintiff's § 1983 claim.

## CONCLUSION

This Court, therefore, finds that Plaintiff set forth sufficient facts from which a trier of fact could conclude that there was objective awareness as to the seriousness of Plaintiff's ailment, and a sufficient factual dispute as to whether Defendants Rose, Mazzacone and Maxwell had the subjective knowledge that their acts or omissions amounted to deliberate indifference to Plaintiff's serious medical needs. The Court does, however, agree with the district court as to its determination that Plaintiff's evidence regarding the conduct of Defendants Kemper and Hammermeister should not be deemed sufficient to satisfy the definition of deliberate indiffer-

ence. Moreover, Plaintiff did not set forth sufficient facts to establish there was a custom or policy in place that resulted in the violation of Plaintiff's constitutional rights. Finally, since Plaintiff's right to be free from cruel and unusual punishment was clearly established such that a reasonable official would have understood his conduct violated that right, qualified immunity should be denied as to Defendants Mazzacone, Rose and Maxwell, but not as to Kemper and Hammermeister.

Therefore, this Court will REVERSE the district court's decision in part, and REMAND for further proceedings consistent with this opinion.

SUHRHEINRICH, J., I concur in the result only.